J. Gene JACKSON and Ruth
L. Jackson, Appellees,

v.

STATE BANK OF WAPELLO,
Appellant.

No. 90–1912.

Supreme Court of Iowa.

June 17, 1992.

Rehearing Denied July 29, 1992.

George A. Goebel and Bryan L. Sylvester of Goebel & Koury Law Offices, Davenport, for appellant.

William Scott Power and Patrick L. Woodward of Aspelmeier, Fisch, Power, Warner & Engberg, Burlington, for appellees.

Considered by SCHULTZ, P.J., and LAVORATO, NEUMAN, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

This case concerns a farmer who was pitted in a six-year battle against the elements, and the elements won. The farmer's local bank appeals from an adverse jury verdict in the farmer's case against the bank. The bank raises a number of issues, but we need reach only two. The first issue is whether there was sufficient

evidence to submit the farmer's breach of contract claim premised on the bank's alleged bad faith in failing to advance the balance of payments on a yearly operating loan. The second issue is closely tied to the first: whether there was sufficient evidence to submit the farmer's claim of intentional interference with contractual relations. This claim is premised on the theory that the bank's alleged improper action in terminating the loan caused the farmer to lose his farm.

Because we think there was insufficient evidence to submit either claim, we reverse.

In 1975 Jackson Farms, a family partnership, purchased a 568–acre Louisa county farm (the Jackson farm). At the time J. Gene Jackson and his wife, Ruth—plaintiffs in this action—were partners in Jackson Farms. The remaining partners were Gene's mother and stepfather.

The farm sat adjacent to the Iowa River and consisted primarily of heavy soiled river bottomland. When the farm was purchased, it had 270 tillable acres. Later improvements to the farm increased the number of tillable acres to 445 by 1986. Between 1975 and 1980, a third party ran the farm.

In 1977 Gene became a customer of the State Bank of Wapello (bank). At that time he borrowed $51,000 from the bank for a bulldozer. In September 1978 the bank loaned Gene $60,000 to construct a home on a five-acre tract of land not at issue in this appeal.

In 1980 the partnership paid off the real estate contract on the Jackson farm. It did so by borrowing $150,000 from Connecticut General Life Insurance Company. Under the note and mortgage, a yearly payment of $3000 was due each February 1.

That same year Gene gave up his career as a real estate broker in Wapello and began farming the Jackson farm himself. He put the land to row crops, raising corn and soybeans. He did not raise any livestock.

At this point Gene began borrowing money from the bank for yearly farm operating expenses. These loans were based on revenue and expense projections Gene prepared. The projections were quite detailed due to Gene's education and early work experience as an accountant.

In 1980 the bank loaned Gene $20,000. The loan was paid off at the end of the year.

In 1981 Gene borrowed operating funds from the bank and this loan was paid off early in 1982. Gene also borrowed $25,000 in 1981 from the bank to buy a used combine. The note for this loan was set up on a three-year annual repayment schedule. At the end of that period the outstanding balance was $18,000. This note was extended to 1984.

Gene borrowed some money from the bank in 1982. J & J Enterprises—a farm operating partnership between Gene and his uncle—borrowed $20,000 for operating expenses. The note evidencing this loan carried a $10,000 balance at the end of 1982 and was eventually paid off in early 1983.

Jackson Farms also borrowed money from the bank for operating expenses in 1982. The note for this loan had an outstanding balance at year's end of $40,000. This note was not paid off but extended.

At some point in 1982 J & J Enterprises was liquidated because of the uncle's health problems. So Gene borrowed $15,000 from the bank to purchase his uncle's half interest in the partnership's farm machinery. This loan was evidenced by a note calling for three annual payments. Gene was unable to make the first payment.

Revenues that year were not as Gene had projected. Successive floods in May, June, and July completely wiped out his thrice-planted crops.

At this point Gene's total farm indebtedness to the bank for principal and interest on the farm's outstanding notes stood at about $100,000. The bank consolidated these four notes into one note having a face value of $100,912, which all four partners in Jackson Farms signed in January 1983. The note was for one year, renewable annually. For security the bank took (1) a second mortgage on the Jackson farm, (2) a second mortgage on Gene's and

Ruth's home, and (3) a lien on all of Gene's farm machinery and crops.

In 1983 Gene and Ruth became the sole proprietors of the Jackson farm when they purchased the other two parties' interests. No operating money was borrowed that year. Instead, the entire Jackson farm was put into the PIK program. (The PIK program is a federally funded program that pays farmers to set aside their land.) In retrospect this was a wise decision because 185 of the tillable acres were too wet to seed.

Gene applied part of the PIK participation check toward the consolidated note. He used the balance to live on in 1983 and 1984 and to plant the 1984 crops.

The record is unclear as to whether Gene borrowed any funds in 1984. In January 1984, Gene did pay $11,000 toward the consolidated note, leaving a balance of $90,000. Again revenues did not meet projections. The crops were planted late and an early frost cut down corn yields considerably. All 147 acres of beans were lost because of the early frost. So Gene was unable to pay in full the interest due on the consolidated note.

In February 1985 Gene paid the interest due on the consolidated note, renewing it for another year. In addition, Gene borrowed from the bank $105,491 for operating expenses. Under the terms of the note covering this loan, the bank agreed to advance funds on a monthly basis. The bank took a third mortgage on the Jacksons' home as security for this loan.

The projected yields did not materialize in 1985 because it was a dry year. Gene also incurred some unexpected tractor repairs that cost about $10,000. He paid the repairs out of his farm operating loan. At the end of the calendar year the unpaid balance including interest on the 1985 operating note was about $7500. This was in addition to the outstanding principal balance on the consolidated note which was about $90,000.

During the early 1980s, like other Iowa farms, the Jackson farm was experiencing a severe drop in land values. As a result, Gene's net worth fell substantially from a high of about $223,000 in 1981 to a low of about $53,000 in December 1985.

Concern about this decline in net worth caused A.T. Wollenhaupt—chairman of the board and assistant trust officer of the bank—to write Gene a letter in August 1985 about the need to discuss continuing financing. This letter led to a meeting between Gene and Ken Turner, an assistant vice president of the bank. Turner suggested that they jointly pursue FmHA loan guarantees on Gene's outstanding obligations and any operating loan Gene would need for 1986. (Such a loan guarantee assures a farm lender that, in the event of default, the FmHA will pay the lender ninety percent of the outstanding balance.)

With the guarantees in place, the bank would rewrite the existing notes at a lower interest rate and over a longer period of time. Gene filed an application with the FmHA for the guarantees, using his operating projections for 1986. Unbeknownst to Gene, the bank had the farm appraised in the application process. The appraised value of the farm as of December 1985 was $241,000.

In 1986 Gene undertook another farm operation. He cash rented a 260–acre farm known as the Schmeiser farm.

In February 1986 Gene was unable to pay either the principal or the interest due on the consolidated note. That same month Gene secured an operating loan for 1986 from the bank in the amount of $104,-000.

The $104,000 loan was based on Gene's detailed projections of revenues, costs, and expenses for the 1986 crop year. Included in this projection were living expenses, two payments to Connecticut General on the Jackson farm first mortgage, and rent on the Schmeiser farm. All of these expenses were to be paid from the operating loan.

Gene estimated in this projection that he would plant 190 acres of corn and 210 acres of beans on the Jackson farm. He estimated corn revenue on the Jackson farm at $57,912 (190 acres × 120 bushels per acre × $2.54 market price per bushel). His bean revenue estimate on that farm was

$33,600 (210 acres × 32 bushels per acre ×$5 market price per bushel).

At the time Gene executed the note for the $104,000 loan, he reviewed it and understood its terms. He was also aware that the note contained the following provision:

Holder [of the note] may require any and all documentation and additional confirmations to authorization for any requested advance. Failure to provide said data in form(s) satisfactory to holder or a default on any note, obligation or agreement with holder or *if holder deems itself insecure shall cause the holder, at its option, to refuse to honor the request for an advance of funds.*

(Emphasis added.) This note was secured by all of Gene's equipment, tools, supplies, livestock, grain on hand, the growing crops on both the Jackson and Schmeiser farms, and the existing real estate mortgages with the bank.

The FmHA guarantees were secured on March 17, 1986. The bank then extended the $90,000 consolidated note and wrote a second note for $28,593.58. The second note covered the $7500 balance due on the 1985 operating loan and interest due on the consolidated note and the 1985 operating note.

Gene planted about 200 acres of corn in early May 1986. Toward the latter part of the month, a flash flood covered the 200 acres of planted corn. Gene lost eighty-five acres of planted corn and suffered substantial damage to the remaining 115 acres. The levee surrounding the farm was damaged in five places, subjecting the farm to the risk of flooding at lower river stages.

On June 11 Gene notified the bank of the damage. The bank and Gene agreed that he should replant the eighty-five acres, which he did about the middle of June. The bank agreed to disburse funds to cover the replanting expenses.

Gene also informed the bank on June 11 that because of the flood the farm's overall corn yield would be reduced by about twenty-five percent. Gene expressed concern that there would not be enough money

generated to pay the FmHA guaranteed payments.

Wollenhaupt became concerned about the bank's $104,000 commitment for 1986. However, based on Gene's recalculations of June 11, Wollenhaupt became convinced that following replanting of the corn, there would be sufficient income to pay the note.

About July 1 Gene planted 160 acres of beans, which were fifty acres less than he had originally projected. Wet ground accounted for this reduction. This, of course, reduced the anticipated income that figured into the bank's calculations of June 11.

On July 2 Gene went to the bank for June's disbursement for expenses. At that time Gene told Wollenhaupt that he might have some difficulty making his year-end loan payments if there was any more flooding or an early frost.

On July 10 Gene presented operating expense bills—including the replanting expenses—to the bank for payment. The bank released the funds to meet these obligations. At this point the amount advanced under the 1986 operating note stood at $67,554.21.

Shortly after that, backwater seeped into the lower end of the Jackson farm. As a result, forty acres of beans were lost. This reduced the available bean acres to 120. The forty acres lost were never replanted. Gene's projected bean estimate was now ninety acres short.

On July 22 Gene told Wollenhaupt about the forty acres of beans that were lost. Wollenhaupt informed Gene that the bank would not put any more money into the farm "now, next year, or ever." During this conversation, Gene spoke about selling the Jackson farm.

Following this conversation Gene contacted a local auctioneer and appraiser about what the farm was worth. The appraiser gave his opinion that the farm was worth about $170,000. This was a significant drop from the $241,000 appraisal the bank had received the previous December.

On July 30, Gene contacted a lawyer about his financial situation. The next day

Gene presented a liquidation and debt forgiveness plan to the bank.

In the plan Gene calculated that the remaining grain and harvesting expenses for 1986 plus the money the bank had already advanced under the 1986 operating note would exceed the amount of revenue generated by the crops. In addition Gene offered to help the bank sell the Jackson farm, harvest the crops on both farms, and turn over to the bank his 1986 deficiency payment. In return Gene wanted the bank to forgive some of his outstanding debt and release his mother and stepfather from liability on the consolidated note.

On August 5 an officer of the bank and an FmHA inspector looked at the crops on the Jackson farm. The inspector's report on the visit stated that "the crop isn't very good this year." The inspector consequently recommended liquidation.

On or about August 6 Gene requested the disbursement of funds for July operating expenses. The bank refused to advance the funds.

On August 14 Gene wrote the bank a three-page letter in which he outlined the crop history and note terms. He acknowledged substantial borrowings from the bank and that the bank could not continue financing his operation if he was not able to make his payments. The letter makes no mention of the bank calling Gene's loan.

Three subsequent attempts—by letter—to negotiate an agreement regarding liquidation and forgiveness failed. However, Gene and the bank negotiated an agreement in October 1986. Under it the bank received Gene's standing crops on both the Jackson and Schmeiser farms. The bank paid Gene about $15,000 for doing the harvesting and agreed that this amount would be protected in any future bankruptcy proceeding. The bank also agreed to pay the second half of the Schmeiser farm rent when it came due. At the same time Gene also released to the bank government deficiency payments that were due him.

Following the agreement, Gene harvested the crops. It then became apparent that more crops existed than originally projected by Gene and the bank. As a result Gene was able to pay off the operating loan for 1986 and was able to pay down the $28,593.58 note guaranteed by the FmHA. This left Gene's total indebtedness to the bank on the FmHA secured notes at $112,123.88 plus interest.

The Jacksons filed for bankruptcy on October 31, 1986. They ultimately lost the Jackson farm to Connecticut General through foreclosure.

The bank moved for directed verdict during trial on the two theories that were ultimately submitted to the jury. The jury determined the Jacksons were entitled to damages in the amount of $31,729 on their breach of contract claim and $81,020 on their intentional interference with contractual relations claim. Later the district court entered judgment for $116,749 and overruled the bank's posttrial motions for judgment notwithstanding the verdict and for new trial.

On appeal, the bank challenges the district court's rulings on the motion for directed verdict and the posttrial motions. The crux of its challenge is that there was not sufficient evidence to submit either the contract theory or the tort theory.

### I. *Scope of Review.*

Our scope of review is for errors at law. *See* Iowa R.App.P. 4. In reviewing rulings on motions for directed verdict and judgment notwithstanding the verdict, we simply need ask whether there was sufficient evidence to generate a jury question. *Federal Land Bank of Omaha v. Woods,* 480 N.W.2d 61, 65 (Iowa 1992). Evidence is sufficient if there is substantial evidence to support every element of the claim submitted. *Dirks v. Farm Bureau Mut. Ins. Co.,* 465 N.W.2d 857, 859 (Iowa 1991). Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion. *Johnson v. Dodgen,* 451 N.W.2d 168, 171 (Iowa 1990). In applying the substantial evidence standard, we—like the district court—view the evidence in the light most favorable to the party against whom the motions for directed verdict and judgment notwithstanding the verdict are

directed. *Id.* In this case that would be the Jacksons.

With these principles in mind we consider whether there was substantial evidence on every element of both theories submitted to the jury.

## II. *The Breach of Contract Claim.*

In refusing to advance any further funds, the bank relied on the clause in the 1986 operating note that permitted it to do so if it deemed itself insecure. Two Iowa statutes control our analysis on this point: Iowa Code section 554.1208 and Iowa Code section 554.1201(19). Section 554.1208 pertinently provides:

> A term providing that one party ... may accelerate payment ... "when the party deems itself insecure" or in words of similar import shall be construed to mean that that party shall have power to do so *only if that party in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.*

Iowa Code § 554.1208 (1985) (emphasis added). Section 554.1201(19) defines commercial good faith as "honesty in fact in the conduct or transaction concerned."

As applied to this case, the bank could—without breaching the contract—refuse further advances if it in good faith believed that the prospect of receiving payment on the operating note was impaired. And the Jacksons had the burden of proving the lack of such good faith.

■ This burden is heavy because this court has said the test of good faith—or lack of it—is a "wholly subjective one of honesty." *Farmers Coop Elevator, Inc. v. State Bank,* 236 N.W.2d 674, 678 (Iowa 1975); *accord Tolander v. Farmers Nat'l Bank,* 452 N.W.2d 422, 426 (Iowa 1990). And proof of lack of good faith must be by substantial evidence; a mere scintilla is not enough. *Farmers Coop.,* 236 N.W.2d at 677.

In *Farmers Cocp* we rejected the argument "that the good faith required by sec-

tion 554.1208 requires not only honesty in fact but also a *reasonable* belief in impairment of the prospect of payment." *Farmers Coop,* 236 N.W.2d at 678 (emphasis in original). In expanding on this point, we agree that

> [a]s good faith means only honesty in fact, negligence ordinarily has no significance. That is, the honesty in fact that constitutes good faith merely requires honesty of intent and it is not necessary to show that the person was diligent or nonnegligent. Bad faith, then, is obviously something far more extreme than a failure to observe reasonable commercial standards or the standards of a reasonably prudent [person]. It is irrelevant that the person in question was negligent in forming a particular belief. All that is required ... is the actual belief or satisfaction of the criterion of "the pure heart and empty head."

1 R. Anderson, *Uniform Commercial Code* § 1–201:96, at 238 (3d ed. 1981) (citations omitted). *See also Valley Nat'l Bank v. Porter,* 705 F.2d 1027, 1029 (8th Cir.1983) (per curiam) (bad faith not proven by showing of mere negligence or knowledge of suspicious circumstances).

■ Simply put, the question is whether the creditor acted *honestly,* not whether the creditor acted *reasonably.* Put another way, as long as the creditor honestly believes the creditor is insecure, that is enough. Under this standard, then, it makes no difference that the facts ultimately establish the creditor was wrong and payment was not impaired.

■ Guided by these principles, we turn to the critical question before us: Did the bank honestly believe the prospect for payment was impaired at the time it decided not to advance further funds? Viewing the evidence in the light most favorable to the Jacksons, we must accept Gene's testimony that this decision was made on July 22, 1986. It was then that he claimed he was told that the bank would advance no further funds.

The answer to our question depends on the information the bank had on that date. On that date it knew several significant

things. The bank knew that Gene's net worth had declined significantly between 1981 ($222,879) and 1985 ($52,323). The bank also knew that planting crops on the Jackson farm was risky business. Over the years Gene's crops were periodically flooded out or hurt by early frost. This, of course, had a negative impact on his ability to repay on loans.

Gene made total income projections for 1986 to the bank of $177,000. Based on this information the bank went ahead and committed itself to a $104,000 operating loan for the year. By Gene's own calculations, the income projection was geared downward to $123,000 because of the May flooding. As early as June 11 Gene was expressing concern to the bank about his ability to make year-end payments. The bank was in the position of a lender who is told by the borrower that the loan probably cannot be paid when due. In this scenario, the borrower backs up this statement with reliable projections.

Then the problem was compounded when, on July 1, Gene had to plant fifty acres less in beans than he had originally planned. At this point Gene told the bank that if he had any more flooding or if there was an early frost, he might have some difficulty making his year-end loan payments.

The final blow came when forty acres of beans were lost because of more flooding. Gene imparted this last bit of information to the bank on July 22 when the bank finally told him that it had had enough. No further advances would be forthcoming.

All of this evidence is uncontroverted and most of it comes from Gene himself. We fail to see any substantial evidence in the record indicating the bank did not honestly believe on July 22 that payment was impaired. Whether this belief was reasonable or in retrospect was wrong, makes no difference.

Neither do we see any substantial evidence of ulterior motive on the part of the bank. The Jacksons suggest the bank's desire to avail itself of the FmHA guarantees provides this motive. There is no evidence to support this. In fact, the evidence belies any such motive. The bank first sought advice from the FmHA before formally refusing to make the August advancement. After one of its inspectors inspected the crops on the Jackson farm, the FmHA itself recommended liquidation.

For all these reasons, we think the district court should have sustained the bank's motion for directed verdict or its motion for judgment notwithstanding the verdict. Its failure to do so was error.

### III. *The Intentional Interference With Contractual Relations Claim.*

■ Part of the expenses to be covered by the $104,000 operating loan included two payments to Connecticut General on the Jackson farm first mortgage. The Jacksons simply claim that the bank interfered with their contract (mortgage) with Connecticut General when the bank refused to advance any further funds under the operating note. The damage they claim, of course, is the loss of their farm because they had no funds to pay Connecticut General.

■ One element of this tort is that the bank *improperly* interfered with an existing contract. *See Toney v. Casey's General Stores, Inc.*, 460 N.W.2d 849, 852 (Iowa 1990). In view of our holding in division II, the bank violated no contractual provision under the note when it refused to advance any further funds because it deemed itself insecure. In short, the bank had—as a matter of law—the right to do what it did. In these circumstances, refusing to advance the funds was not, as a matter of law, improper.

Because there was substantial evidence lacking on the improper interference element, the district court should have likewise sustained the bank's motion for directed verdict or judgment notwithstanding the verdict. Its failure to do so was also error.

### IV. *Disposition.*

In sum, we must reverse because there was no substantial evidence to support submission of either claim. We remand with

directions to enter judgment for the bank as if the motion for directed verdict or the motion for judgment notwithstanding the verdict had been sustained.

We have carefully considered all arguments and contentions raised by the parties on these two issues whether we have mentioned them or not.

In view of our holding, the remaining issues the bank raises on appeal are moot.

REVERSED AND REMANDED WITH DIRECTIONS.