# IN THE SUPREME COURT OF IOWA

No. 13–0719

Filed April 24, 2015
Amended September 25, 2015

**SHANNON** and **DANNY NELSON,** Individually, and on Behalf of E.N. f/k/a E.N., a Minor,

Appellees,

vs.

**LYNN M. LINDAMAN, LYNN M. LINDAMAN, M.D., P.L.C.** d/b/a LINDAMAN ORTHOPAEDIC, and **MERCY MEDICAL CENTER – DES MOINES,**

Appellants.

---

Appeal from the Iowa District Court for Polk County, Robert J. Blink, Judge.

Medical defendants, sued for malpractice for failing to detect child abuse, appeal district court's order denying their motion for summary judgment based on immunity under Iowa Code section 232.73 for assisting the investigation by the Iowa Department of Human Services. **REVERSED AND REMANDED WITH DIRECTIONS.**

John T. Clendenin, Hayward L. Draper, Ryan G. Koopmans, and Jess W. Vilsack of Nyemaster Goode, P.C., Des Moines, for appellants Lynn M. Lindaman and Lynn M. Lindaman, M.D., P.L.C.

Connie L. Diekema, Erik P. Bergeland, Kellen B. Bubach of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellant Mercy Medical Center – Des Moines.

Eric M. Updegraff of Stoltze & Updegraff, P.C., Des Moines, and Jeff Carter and Zachary C. Priebe of Jeff Carter Law Offices, P.C., Des Moines, for appellees.

**WATERMAN, Justice.**

In this appeal, we must address the immunity from civil liability afforded by Iowa Code section 232.73 (2009) for a physician participating in a child abuse assessment. The physician treated the infant victim's broken arm and told the investigator for the Iowa Department of Human Services (DHS) the father's version of how the injury occurred was plausible. The baby was left in his parents' care and three weeks later suffered a severe brain injury while with his father.

The infant's adoptive parents filed this medical malpractice action, alleging the physician's negligence and reckless or willful conduct was a proximate cause of the baby's subsequent injuries because the DHS relied on his assessment to initially decide to leave the baby with the baby's father. The defendants moved for summary judgment, asserting the physician participated in the DHS assessment in good faith and therefore is immune from liability under section 232.73. The district court ruled that questions of fact precluded summary judgment, and we allowed the defendants' interlocutory appeal.

For the reasons explained below, we hold the defendants are entitled to good-faith immunity under section 232.73. Undisputed facts establish the physician participated in good faith in the DHS assessment. We therefore reverse the order denying summary judgment and remand the case for the entry of summary judgment in favor of the defendants.

### I. Background Facts and Proceedings.

The parents of E.N., a three-week-old infant, brought him to the emergency room at Mercy Medical Center with a broken arm on June 18, 2009. His father, Jonas Neiderbach, claimed that he heard a snap as he set his baby down with his arm behind him. Dr. Scott Barron, a pediatric emergency room physician, did not believe the father's story.

Dr. Barron believed the spiral fracture could not have been caused by E.N.'s body weight, especially because the baby's bones were pliable. Dr. Barron reported his concerns to the DHS, which began a child abuse investigation under Iowa Code section 232.70. DHS caseworker Darla Brown came to the hospital, spoke with Dr. Barron and E.N.'s parents, and reviewed E.N.'s medical records. Meanwhile, Dr. Barron referred E.N. to Dr. Selover, who agreed the injury was consistent with abuse. Dr. Selover questioned the father's story because at E.N.'s age infants typically extend their arms forward rather than backwards. Dr. Selover contacted Dr. Lindaman for assistance in treating the fracture. Dr. Lindaman lacked significant experience evaluating claims of child abuse in infants, but as a pediatric orthopedic surgeon was well qualified to treat the fracture.

On June 19, Dr. Lindaman saw E.N. and successfully immobilized the arm. Dr. Lindaman noted in his treatment plan, "At this time the injury does fit with the mechanism described. I don't see any signs of any other skeletal trauma." Meanwhile, Brown had already told the Polk County Attorney she would probably be requesting a no-contact order against the father. Brown phoned Dr. Lindaman to continue gathering information for her assessment. Her notes of their conversation state:

> This worker spoke[] with Dr. Lindaman . . . . Dr. Lindaman indicated that if the father was holding baby by the chest and laying him down on the bed, placing him down with one side of his body coming into contact with the bed first, that it was plausible that the arm on that side of the body could get pinned under his body behind him.
>
> This worker questioned whether a child, weighing only 8 lbs. 11 oz., would have enough force to create this injury. I also provided information that dad had provided a different explanation with how he laid [E.N.] down, with one hand under its head and the other under its butt. I also questioned whether a crying child's arm would go back behind him as he would more likely to be pulling his arms

tight in front of him. Through this line of questioning, he stated on several occasions, "the mechanism they described fits the fracture seen."

Dr. Lindaman also indicated that he did not see any other injuries. He also stated that the family appeared appropriate and they brought [E.N.] in immediately. Dr. Lindaman stated that he saw no evidence to indicate healing of the fracture, which would indicate it was consistent with the time frame provided by parents. All these factors lead to his assessment of the injury.

Following her conversation with Dr. Lindaman, Brown decided not to seek a no-contact order and allowed E.N. to go home with a family safety plan in place. E.N.'s parents and paternal grandfather, with whom E.N. lived, agreed that E.N.'s father would not be left alone with E.N. Due to her continuing concerns and what she saw as conflicting medical opinions, Brown spoke with her supervisor and scheduled a multidisciplinary team meeting for June 30 to discuss E.N.'s case.

On June 26, Dr. Lindaman conducted a follow-up visit with E.N. at his office. Dr. Lindaman performed a physical examination while E.N. remained in his mother's arms. The arm bone was in good alignment and x-rays taken that day showed good early healing. Dr. Lindaman focused on the healing arm bone fracture without examining E.N. for signs of any other injuries. It is unknown whether a full body examination that day would have detected the rib fractures that were discovered twelve days later.

The multidisciplinary team meeting on June 30 involved representatives of the Polk County Attorney's Office, the DHS, Des Moines police, and medical professionals. Every medical professional present agreed that E.N.'s injuries could not have occurred as the father described them. Dr. Oral reviewed the radiographs with two additional colleagues including another pediatric orthopedic specialist to confirm that the story the father told was inconsistent with

the type of injury. After receiving an email from Dr. Oral, Brown prepared the paperwork requesting a no-contact order for E.N.'s father on July 6. Meanwhile, Dr. McAuliff explained the reasons for the multidisciplinary team's conclusions to Dr. Lindaman, including the fact that infant flexor tone at one month does not allow an infant's arms to easily fall behind its body. After that discussion, Dr. Lindaman did not change his original opinion regarding biomechanics, but acknowledged the flexor tone information made the father's story very unlikely.

The court entered the no-contact order on Wednesday, July 8. Normally, such orders are served immediately. However, the DHS decided to serve the no-contact order on Friday, July 10 when the family returned from a nearby camping trip. In fact, the family was not camping. E.N.'s grandfather (a DHS employee) took E.N. to DHS headquarters the afternoon of July 8 to meet his coworkers, and E.N. appeared to be in good health at that time. The DHS did not attempt to serve the order that afternoon. On the evening of July 8, E.N. was admitted to the hospital with massive brain injuries. E.N. also had seventeen rib fractures, some fresh and some older.

E.N.'s mother and father were charged with child endangerment. The mother pled guilty and was sentenced to twenty years in prison. The father was found guilty by a Polk County jury and sentenced to fifty years in prison. *See State v. Neiderbach*, 837 N.W.2d 180, 189 (Iowa 2013).

In an affidavit executed January 10, 2013, Dr. Lindaman described his involvement with E.N. and the DHS. He described his impression of being called in for a limited consultation regarding the treatment of a fracture. He states that he was aware other physicians were already evaluating child abuse issues, and therefore he

made no effort to make my own evaluation of the credibility of the father with regard to the medical history . . . . The only opinion I developed was that . . . the history could possibly be consistent with the type of spiral humeral fracture I observed in this child.

Dr. Lindaman also described his phone call with Brown as follows:

As the DHS investigator's notes of the call they had with me indicate, I refused to give them any opinion regarding the credibility of the father's story or regarding child abuse, even though they raised with me some issues that they thought undercut his credibility. The reason I refused to give them any opinion regarding credibility and child abuse is because I had not performed an investigation regarding child abuse. Therefore, each time the DHS raised an issue concerning that, I repeated the only opinion I could help them with for their assessment; namely, my opinion that, as a matter of biomechanics, the mechanism that the parents had described to me fit the fracture seen, by which I meant that the father's story about the arm being pinned and twisted behind the child's back, if true, could be consistent with a spiral humeral fracture occurring in that arm.

E.N. was subsequently adopted by Shannon and Danny Nelson. On June 10, 2011, they filed this action individually and on behalf of E.N. They alleged Dr. Lindaman negligently failed to detect and report the child abuse and that Mercy Medical Center – Des Moines was vicariously liable for Dr. Lindaman's negligence.[1] The Nelsons further alleged Dr. Lindaman's conduct was "reckless and/or willful" and sought punitive damages against him and Mercy. The Nelsons never alleged Dr. Lindaman believed the statements he made to DHS were untrue. The Nelsons do not claim Dr. Lindaman mistreated the arm fracture itself.

Defendants moved for summary judgment on several grounds: the immunity under Iowa Code section 232.73 and the lack of evidence to prove causation or the willful and wanton misconduct required for

---

[1]The Nelsons sued Dr. Lindaman personally as well as "Lynn M. Lindaman, M.D., P.L.C. d/b/a Lindaman Orthopaedic." We will refer to both as "Dr. Lindaman."

punitive damages. The Nelsons resisted and submitted expert medical testimony that Dr. Lindaman breached the standard of care. The Nelsons also argued defendants waived the immunity defense by failing to plead it. Defendants filed motions to amend their answers to plead immunity, and the district court allowed the amendments.[2] On April 1, 2013, the court denied the summary judgment motions, stating:

> Based upon the record made the court concludes that the summary judgment motions should be denied. There are genuine issues of material fact as to whether the defendant doctor rendered an opinion or not for DHS, whether reliance on that opinion caused injury to the child, whether the doctor's communications to DHS were in good faith or not, whether the doctor's conduct provides immunity and whether the communication with DHS was actually aiding or assisting in a child abuse assessment.

We granted defendants' application for interlocutory appeal and retained the appeal.

**II. Standard of Review.**

"We review a district court decision granting or denying a motion for summary judgment for correction of errors at law." *Wallace v. Des Moines Indep. Cmty. Sch. Dist. Bd. of Dirs.*, 754 N.W.2d 854, 857 (Iowa 2008). "A matter may be resolved on summary judgment if the record reveals only a conflict concerning the legal consequences of undisputed facts." *Id.*; *see also Garvis v. Scholten*, 492 N.W.2d 402, 403 (Iowa 1992) (same). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled

---

[2]The Nelsons do not specifically argue on appeal that the district court abused its discretion by allowing the amendments. The Nelsons' appellate brief argues the amendments were untimely, but articulates no unfair prejudice resulting from the delay in pleading the immunity defense. We conclude the district court acted within its discretion by allowing the amendments and, therefore, reject the Nelsons' waiver argument.

to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "The moving party has the burden of showing the nonexistence of a material fact." *Hlubek v. Pelecky*, 701 N.W.2d 93, 95 (Iowa 2005). "An issue of fact is 'material' only when the dispute involves facts which might affect the outcome of the suit, given the applicable governing law." *Wallace*, 754 N.W.2d at 857. An issue is "genuine" if the evidence in the record "is such that a reasonable jury could return a verdict for the non-moving party." *Id.* We view the evidence in the light most favorable to the nonmoving party, who is entitled to every legitimate inference that we may draw from the record. *Id.* "Speculation is not sufficient to generate a genuine issue of fact." *Hlubek,* 701 N.W.2d at 96.

**III. Analysis.**

We must decide whether the district court erred by denying defendants' motion for summary judgment based on the statutory immunity in Iowa Code section 232.73. We will discuss the scope of immunity under that statute and then address whether the defendants were entitled to summary judgment on the record in this case.

We begin with the text of section 232.73, which in relevant part provides:

> A person participating in good faith in the making of a report, photographs, or X rays, or in the performance of a medically relevant test pursuant to this chapter, or aiding and assisting in an assessment of a child abuse report pursuant to section 232.71B, shall have immunity from any liability, civil or criminal, which might otherwise be incurred or imposed. The person shall have the same immunity with respect to participation in good faith in any judicial proceeding resulting from the report or relating to the subject matter of the report.

Iowa Code § 232.73(1).

Section 232.73 provides a form of qualified immunity. *See Hlubek,* 701 N.W.2d at 96 (noting statutes immunizing conduct performed in

good faith provide qualified, not absolute, immunity). "Qualified immunity is a question of law for the court and the issue may be decided by summary judgment." *Dickerson v. Mertz*, 547 N.W.2d 208, 215 (Iowa 1996); *see also Garvis*, 492 N.W.2d at 404 (affirming summary judgment based on section 232.73 immunity); *Maples v. Siddiqui*, 450 N.W.2d 529, 531 (Iowa 1990) (same). Summary judgment is an important procedure in statutory immunity cases because a key purpose of the immunity is to avoid costly litigation, and that legislative goal is thwarted when claims subject to immunity proceed to trial. *See Plumhoff v. Rickard*, ___ U.S. ___, ___, 134 S. Ct. 2012, 2019, 188 L. Ed. 2d 1056, 1064 (2014) ("[T]his [immunity] question could not be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost."); *Hlubek*, 701 N.W.2d at 98 (noting statutory immunity removes the " 'fear of being sued' " and affirming summary judgment (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736, 73 L. Ed. 2d 396, 408 (1982))). Indeed, in *Hlubek*, we recognized the defendants' observation that "statutory immunity, like common-law immunity, provides more than protection from liability; it provides protection from even having to go to trial in some circumstances." 701 N.W.2d at 96. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411, 425 (1985).

In *Garvis*, we specifically noted the purpose of immunity under section 232.73 is to remove "the fear of litigation" for those assisting child abuse investigations. 492 N.W.2d at 404; *see also* Ellen Wright Clayton, *To Protect Children from Abuse and Neglect, Protect Physician Reporters*, 1 Hous. J. Health L. & Pol'y 133, 146 (2001) (calling for

absolute immunity for physicians reporting child abuse or assisting investigations into suspected child abuse because "[r]elieving the fear of litigation will promote appropriate reporting"). Defendants argue that to allow the claims in this case to proceed to trial would have a chilling effect on the willingness of the medical community to communicate with child abuse investigators. We share that concern and apply the immunity statute as written to effectuate its purpose.

**A. The Scope of Immunity Under Iowa Code Section 232.73.** Section 232.73 applies in medical malpractice actions brought against private physicians who provide information to child abuse investigators. *Maples*, 450 N.W.2d at 530–31. The purpose of the statute is "to encourage those who suspect child abuse to freely report it to authorities without fear of reprisal if their factual information proves to be faulty." *Id.* at 530. "An additional purpose is to encourage those having information about child abuse to come forward when asked to do so, without the fear of litigation should it later be shown that the information was improperly released." *Garvis*, 492 N.W.2d at 404. These legislative purposes, in our view, apply equally to both physicians who initiate reports to the DHS, and to those, such as Dr. Lindaman, who respond to inquiries from child abuse investigators. The statute applies the same good-faith immunity to both those who report suspected abuse and those who assist in investigations initiated by others.

"Good faith" under section 232.73 is determined under a subjective standard. *Id.* "Reasonableness and the objective (reasonable person) standard are the hallmarks of negligence. Because immunity under section 232.73 extends to negligent acts, reasonableness and the objective standard play no part in determining good faith." *Id.* Therefore, good faith "rests on a defendant's subjective honest belief that

the defendant is aiding and assisting in the investigation of a child abuse report." *Id.* We further observed:

> "As good faith means only honesty in fact, negligence ordinarily has no significance. That is, the honesty in fact that constitutes good faith merely requires honesty of intent and it is not necessary to show that the person was diligent or non-negligent. Bad faith, then, is obviously something far more extreme than a failure to observe reasonable . . . standards or the standards of a reasonably prudent [person]. It is irrelevant that the person in question was negligent in forming a particular belief. All that is required . . . is the actual belief or satisfaction of the criterion of 'the pure heart and empty head.' "

*Id.* (quoting *Jackson v. State Bank of Wapello*, 488 N.W.2d 151, 156 (Iowa 1992)). Thus, persons aiding or assisting in a child abuse investigation are entitled to immunity under section 232.73 if they act in good faith as we described in *Garvis*. To avoid summary judgment, the plaintiff must have evidence the defendant acted dishonestly, not merely carelessly, in assisting the DHS. *Id.*

We are mindful of the legislative directive that chapter 232 "shall be liberally construed to the end that each child under the jurisdiction of the court shall receive . . . the care, guidance and control that will best serve the child's welfare." Iowa Code § 232.1. The legislature elaborated on the purpose of the child abuse reporting provisions:

> Children in this state are in urgent need of protection from abuse. It is the purpose and policy of this part 2 of division III to provide the greatest possible protection to victims or potential victims of abuse *through encouraging the increased reporting of suspected cases of abuse, ensuring the thorough and prompt assessment of these reports*, and providing rehabilitative services, where appropriate and whenever possible to abused children and their families which will stabilize the home environment so that the family can remain intact without further danger to the child.

*Id.* § 232.67 (emphasis added). We have observed that "the forceful language of the statute articulates a well-recognized and defined public

policy of Iowa." *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 301 (Iowa 1998). We therefore construe the immunity provision in section 232.73 liberally to encourage communications between physicians and DHS child abuse investigators. This is consistent with our general approach to construe statutory immunity provisions broadly. *See Cubit v. Mahaska County*, 677 N.W.2d 777, 784 (Iowa 2004) (surveying cases construing Iowa statutory immunity provisions broadly and exceptions to immunity narrowly).

In *Maples*, parents brought their four-month-old child to a hospital where Dr. Siddiqui diagnosed the baby with failure to thrive that she attributed to poor parenting skills. 450 N.W.2d at 529. The child was placed in temporary foster care, but further studies determined that malabsorption syndrome was responsible for his failure to gain weight. *Id.* at 530. After the child was returned to his parents, they sued Dr. Siddiqui for their loss of companionship and society while the child was in foster care. *Id.* Dr. Siddiqui moved for summary judgment based on section 232.73 immunity. *Id.* The district court granted summary judgment, and we affirmed. *Id.* at 530–31.

The case turned on the communication Dr. Siddiqui made to the juvenile authorities. *Id.* at 530. That communication caused the child's removal from the home. *Id.* The parents argued that the doctor's negligence in diagnosing his condition negated the good-faith element of section 232.73. *Id.* We disagreed because the parents' interpretation "would thwart the apparent purpose of section 232.73, which is to encourage those who suspect child abuse to freely report it to the authorities without fear of reprisal." *Id.* Indeed, we noted that no statutory immunity would be needed unless liability would otherwise exist for a negligent act or breach of duty. *Id.* We observed that our

interpretation "accords with the decisions of courts in other jurisdictions." *Id.* at 531.

In *Garvis*, we elaborated on the good faith required to establish immunity. 492 N.W.2d at 404. Laurene Garvis attended counseling sessions with Dr. Scholten, during which she discussed her relationship with her children. *Id.* at 403. An investigator for the DHS called Dr. Scholten, identified herself as a protective services investigator, and requested information from the counseling sessions. *Id.* Dr. Scholten provided that information, and the child abuse report ultimately proved founded. *Id.* Laurene brought suit for compensatory and punitive damages for disclosure of confidential medical information. *Id.* The parties disagreed whether a subjective or objective standard of good faith should be used to establish immunity under section 232.73. *Id.* at 403–04. We adopted the subjective standard. *Id.* at 404. This followed from *Maples* because we had already decided in that case that the immunity covered negligent acts. *Id.* We affirmed summary judgment dismissing the claims for both compensatory and punitive damages. *Id.*

These cases make clear that a physician responding in good faith to inquiries from a child abuse investigator is entitled to immunity from claims alleging not only negligence, but the willful, wanton, or reckless conduct required for punitive damages. *See id.* at 403–04. The legislature, when it chooses, knows how to limit immunity provisions to simple negligence claims because in other immunity statutes it has carved out exceptions to allow claims alleging gross negligence or other heightened misconduct to proceed.[3] By contrast, section 232.73

---

[3]A look at the current Code illustrates this point. *See, e.g.*, Iowa Code § 85.20(2) (2015) (providing coemployees immunity from a workers' compensation or negligence claim, but allowing claims against coemployees alleging "gross negligence amounting to

expressly provides immunity from "*any* liability, civil or criminal, which might otherwise be incurred or imposed." (Emphasis added.) "This court has no power to read a limitation into the statute that is not supported by the words chosen by the general assembly." *Cubit*, 677 N.W.2d at 782. If the legislature wanted to exclude from section 232.73 claims alleging reckless or willful misconduct, it would have said so, as it has in other statutes providing immunity for persons acting in good faith.[4]

---

such lack of care as to amount to wanton neglect for the safety of another"); *id.* § 669.14(8)–(9) (immunizing the state for negligent design or construction, but allowing claims based on gross negligence); *id.* § 670.4(1)(*g*)–(*h*) (granting the same immunity as section 669.14(8)–(9), but for government subdivisions). Other statutes exclude from immunity provisions claims of intentional or knowing breach of duty. *See, e.g., id.* § 28H.4(2) (immunizing directors and officers of a council of governments "except for acts or omissions which involve intentional misconduct or knowing violation of the law, or for a transaction for which the person derives an improper personal benefit"); *id.* § 497.33 (immunizing a director, officer, member, or volunteer of a cooperative association except for improper benefit, intentional infliction of harm to the cooperative, or intentional violation of law); *id.* § 504.901 (immunizing a director, officer, employee, member, or volunteer of a nonprofit corporation except for financial benefit, intentional harm, or an intentional violation of law); *id.* § 613.19 (granting the same level of immunity to directors, officers, employees, members, trustees, or volunteers of any nonprofit organization); *id.* § 669.24 (immunizing state volunteers from personal liability "except for acts or omissions which involve intentional misconduct or knowing violation of the law or for a transaction from which the person derives an improper personal benefit"). Yet, another set of immunities protects conduct short of actual malice or a criminal offense. *See, e.g., id.* § 461C.6 (recreational immunity exception allowing claims for "willful or malicious failure to guard or warn"); *id.* § 669.14(13) (allowing claims based on an "act or omission [that] constitutes actual malice or a criminal offense"); *id.* § 669.21 (requiring indemnification for tort claims against state employee unless the claim was based on "a willful and wanton act or omission or malfeasance in office").

[4]Again, a look at the current Code illustrates this point. *See, e.g.*, Iowa Code § 91B.2 (immunizing employers who provide work-related information about a current or former employee "in good faith," but not if the employer acted with malice or the information "knowingly is provided to a person who has no legitimate and common interest"); *id.* § 135.147 (granting immunity to a person who "in good faith and at the request of . . . the department of public defense renders emergency care or assistance to a victim of the public health disaster . . . unless such acts or omissions constitute recklessness"); *id.* § 613.17 (giving immunity to any person who "in good faith renders emergency care or assistance without compensation . . . unless such acts or omissions constitute recklessness or willful and wanton misconduct"); *id.* § 915.3 (immunizing "[a]ny person who, in good faith and without remuneration, renders reasonable aid or

**B. The Record Supporting Summary Judgment on Immunity.**

Against this backdrop, we turn to the evidentiary record to determine if defendants were entitled to summary judgment under section 232.73 (2009). The issue is not whether Dr. Lindaman was negligent or even reckless in failing to detect child abuse. Rather, the question is whether he "participat[ed] in good faith . . . in . . . aiding and assisting in an assessment of a child abuse report" within the meaning of section 232.73. We conclude that undisputed facts establish his immunity defense as a matter of law.

Dr. Lindaman was one of E.N.'s treating physicians. It is undisputed the DHS investigator, Brown, elicited Dr. Lindaman's input to help determine whether the baby's fracture resulted from child abuse. Dr. Lindaman responded to the DHS inquiries. He gave his opinion to Brown that the father's version of how the baby's arm was injured was "plausible." As he put it to Brown, the "mechanism described fits the injury seen." That is, he communicated to the DHS that the spiral fracture suffered by E.N. *could have* happened the way the father described. Other doctors disagreed. But, again, the issue is not whether Dr. Lindaman was wrong, reckless, or negligent in forming or communicating his opinion to the DHS. Rather, the question for summary judgment is whether he acted in good faith in participating in the DHS investigation. To avoid summary judgment, the Nelsons needed evidence generating a genuine issue of material fact that Dr. Lindaman acted *dishonestly* in communicating with Brown. *See Garvis*, 492 N.W.2d at 404; *see also Hammel v. Eau Galle Cheese Factory*, 407 F.3d

---

assistance to another against whom a crime is being committed . . ." without any additional qualifying words).

852, 859 (7th Cir. 2005) ("Summary judgment is not a dress rehearsal or practice run, it is the put up or shut up moment in a lawsuit, when a [nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events." (Internal quotation marks omitted.)); *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 245 (Iowa 2006) (affirming summary judgment when nonmoving party failed to "identify specific facts that reveal the alleged underlying motive"); *Hlubek*, 701 N.W.2d at 98 (concluding after review of deposition testimony that nonmoving party resisting summary judgment on good-faith immunity defenses failed to " 'set forth specific facts showing there is a genuine issue for trial' " under [Iowa Rule of Civil Procedure] 1.981(5)); *Hoefer v. Wis. Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 338–39 (Iowa 1991) ("While intentional torts . . . are generally poor candidates for summary judgment because of the subjective nature of motive and intent, the rule is not absolute and . . . there is no genuine issue of fact if there is no evidence." (Citation omitted.) (Internal quotation marks omitted.)).

Courts applying equivalent subjective good-faith immunity statutes have not hesitated to grant or affirm summary judgment when there was no evidence the defendant was dishonest in reporting to the child abuse investigator. *See, e.g., Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 319 (4th Cir. 2009); *Watson v. County of Santa Clara*, 468 F. Supp. 2d 1150, 1156–57 (N.D. Cal. 2007); *O'Heron v. Blaney*, 583 S.E.2d 834, 836–37 (Ga. 2003); *Baldwin Cnty. Hosp. Auth. v. Trawick*, 504 S.E.2d 708, 710 (Ga. Ct. App. 1998); *J.S. v. Berla*, 456 S.W.3d 19, 24 (Ky. Ct. App. 2015); *S.G. v. City of Monroe*, 843 So. 2d 657, 661–64 (La. Ct. App. 2003); *Rite Aid Corp. v. Hagley*, 824 A.2d 107, 121–23 (Md. 2003); *Yuille v. State*, 45 P.3d 1107, 1110–11 (Wash. Ct. App. 2002);

*Whaley v. State*, 956 P.2d 1100, 1106–07 (Wash. Ct. App. 1998); *Lesley v. State*, 921 P.2d 1066, 1075–76 (Wash. Ct. App. 1996); *Thomas v. Sumner,* 341 P.3d 390, 400–01 (Wyo. 2015). As the U.S. Court of Appeals for the Fourth Circuit concluded:

> In other words, the statute provides that immunity will dissolve only in those infrequent circumstances where someone used the reporting system for purposes other than that for which it was designed—namely, the protection of children. It is very clear what the General Assembly wished to do, and we will not make public policy of our own by pursuing a different course—specifically, that of discouraging the reporting of suspected child abuse by exposing either mandatory or voluntary reporters to the significant risk of civil liability. Viewing the evidence in the light most favorable to plaintiffs suggests that Stephens was *at worst* negligent in making the report, and negligence is a far cry from "bad faith."

> Plaintiffs have not alleged or suggested any untoward animus, pre-existing bad blood, desire for revenge, or the like that would strip Stephens of immunity.

*Wolf*, 555 F.3d at 319. The *Watson* court required proof the defendant knowingly made a false report or recklessly disregarded its truth or falsity because permitting a lesser showing to avoid immunity

> would discourage reporting and invite protracted litigation. Indeed, the protections of [California Penal Code] § 11172 would be meaningless if immunity applied only after defendants are able to assert and prove its application in litigation. Thus, plaintiffs' claims fail unless they properly allege facts showing that defendants are not subject to § 11172 immunity. In addition, under § 11172, to the extent plaintiffs claim that defendants are *not* mandatory reporters, plaintiffs nevertheless must allege facts showing that § 11172 immunity does not apply because the report was false and the person making the report knew the report was false when made or made the report with reckless disregard of the truth or falsity. Plaintiffs have not done so.

*Watson*, 468 F. Supp. 2d at 1157 (citation omitted).

The Georgia Supreme Court declined to read an objective reasonableness standard into that state's immunity statute because to

do so would make it more difficult to grant summary judgment and increase litigation risk, resulting in a chilling effect on reporting child abuse:

> A subjective standard is even more appropriate under the child abuse reporting statute because it . . . imposes criminal penalties. Thus, the relevant question is whether the reporter honestly believed she had a duty to report. A reporter acting in good faith will be immune even if she is negligent or exercises bad judgment.
>
> . . . .
>
> . . . The court of appeals confused the two separate aspects of immunity under the statute, superimposing a requirement of reasonableness on the good faith standard. Under the court of appeals standard, even if a reporter has reasonable cause to believe that child abuse has occurred, a jury question could still exist on the issue of bad faith. This interpretation chills the reporting requirement and fails to honor the legislative goal of protecting children by encouraging the reporting of suspected child abuse.

*O'Heron*, 583 S.E.2d at 836–37 (footnotes omitted). The Georgia Court of Appeals elaborated on the subjective good-faith standard and distinguished medical negligence in holding medical defendants were entitled to summary judgment:

> Bad faith is the opposite of good faith, generally implying or involving actual or constructive fraud; or a design to mislead or deceive another; or a neglect or refusal to fulfill some duty, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will. Standing alone, the failure of [the medical center's] personnel to take into consideration the effect [the child's] prescription medicine might have had on the results of her urine test at most constitutes evidence that [the medical center] was negligent or guilty of exercising bad judgment in forming its professional opinion that [the child] might be the subject of child abuse. However, . . . [evidence] of mere negligence or bad judgment is not [equivalent to evidence of a] refus[al] to fulfill [a] professional dut[y], out of some interested or sinister motive, [nor is it equivalent to evidence of a

conscious act based on] some dishonest or improper purpose.

*Baldwin Cnty. Hosp. Auth.*, 504 S.E.2d at 710 (citation omitted) (internal quotations marks omitted).

Washington appellate courts have discussed the proper role of summary judgment on the issue of subjective good-faith immunity in several child abuse reporting cases. In affirming summary judgment for a defendant physician and hospital, the Washington Court of Appeals stated:

> Good faith flows from a "mind indicating honesty and lawfulness of purpose." Good faith is wholly a question of fact. But if reasonable persons could reach but one conclusion, summary judgment is appropriate.
>
> The Yuilles complain that Dr. Feldman and the Hospital reported the abuse here without properly verifying medically that any abuse occurred. Even assuming this is correct, it is insufficient. The statute does not require that the information giving rise to the suspicion of abuse be investigated or verified before it is reported. The duty to investigate lies with the authorities, not the individual making the report. So the failure to verify or investigate does not rule out immunity.

*Yuille*, 45 P.3d at 1111 (quoting *Whaley*, 956 P.2d at 1106). The same appellate court emphasized that evidence of dishonesty is required to avoid summary judgment on the good-faith immunity defense:

> The standard definition of good faith is a state of mind indicating honesty and lawfulness of purpose. Nothing in the record suggests that Hupf was dishonest in reporting her suspicion of abuse or that she acted with any unlawful purpose. The fact that she, as a child care provider, was subject to criminal penalties if she reasonably suspected abuse and failed to report it is a compelling consideration on the side of concluding her purpose was lawful.

*Whaley*, 956 P.2d at 1106 (footnotes omitted). In yet another decision, the Washington Court of Appeals held a physician was entitled to

summary judgment on the good-faith immunity defense when no evidence indicated he acted in bad faith.  *Lesley*, 921 P.2d at 1076.

In *Rite Aid Corp.*, Maryland's highest court surveyed cases from other jurisdictions, including our decision in *Garvis*, to hold a subjective good-faith standard applied for that state's statutory immunity defense and required proof of dishonesty to avoid summary judgment.  824 A.2d at 116–19.  The *Rite Aid Corp.* court acknowledged "questions involving determinations of good faith which involve intent and motive 'ordinarily' are not resolvable on a motion for summary judgment."  *Id.* at 119.  But, the high court went on to say " 'even in cases involving intent and motive, if the prerequisites for summary judgment are met—there [being] no material dispute of fact—summary judgment may be granted.' "  *Id.* (quoting *Gross v. Sussex, Inc.*, 630 A.2d 1156, 1161 (Md. 1993)).  In holding the defendants were entitled to summary judgment, the *Rite Aid Corp.* court stated:

> For the respondents to oppose the summary judgment motion successfully, they must have made a showing, supported by particular facts sufficient to allow a fact finder to conclude that Mr. Rosiak lacked good faith in making the report of suspected child abuse.  They might have done so by producing specific facts showing that Mr. Rosiak knew, or had reason to know, that the photographs did not depict a form of child abuse and, in total disregard of that knowledge, filed a report anyway.  What the respondents have produced are general allegations, that simply show that all of Mr. Rosiak's actions in making the report can be second guessed.  Legitimizing this sort of Monday-morning quarterbacking would render the immunity conferred by [Maryland Code Annotated, Courts and Judicial Proceedings] § 5–620 and [Maryland Code Annotated, Family Law] § 5–708 essentially useless.

*Id.* at 121.

The Wyoming Supreme Court applied that state's subjective good-faith immunity statute to affirm summary judgment dismissing a father's

lawsuit against his son's counselor. *Thomas*, 341 P.3d at 400. The court emphasized evidence of negligence was insufficient to defeat the immunity; to avoid summary judgment, plaintiff must have evidence defendant acted in bad faith, defined "as acting with a malicious motive or making deliberately false accusations." *Id.* at 400–01 (citing *Elmore v. Van Horn*, 844 P.2d 1078, 1083 (Wyo. 1992)). The Kentucky Court of Appeals affirmed summary judgment dismissing a father's lawsuit against a psychologist who performed a custody evaluation. *J.S.*, 456 S.W.3d at 23–24. The court noted that while good faith is a subjective " 'determination of the state of the mind of the actor,' " *id.* at 23 (quoting *Norton Hosps., Inc. v. Peyton*, 381 S.W.3d 286, 292 (Ky. 2012)), summary judgment is appropriate when there is insufficient evidence of bad faith such as "acting with knowledge of the information's falsity." *Id.*

Conversely, courts have denied summary judgment when there was evidence the defendant acted dishonestly reporting child abuse. *See, e.g.*, *Owen v. Watts*, 705 S.E.2d 852, 855 (Ga. Ct. App. 2010) (concluding that the defendant had ulterior motives for a report when the parties were long-standing adversaries in petitions to adopt a child); *J.E.B. v. Danks*, 785 N.W.2d 741, 750 (Minn. 2010) (concluding there was evidence of "personal spite" and exaggerated language in the child abuse report that supported a finding of actual malice).

The summary judgment record in this case is devoid of evidence from which a jury could find Dr. Lindaman acted *dishonestly*—that is, that he believed the statements he made to the DHS were untrue. To the contrary, one of the plaintiff's experts conceded that Dr. Lindaman "believed . . . in his own mind" what he was saying to the DHS and the other expert said, repeatedly, that he had no opinion as to

Dr. Lindaman's state of mind. Summary judgment therefore was appropriate on statutory immunity.

The Nelsons argue immunity should not apply because Dr. Lindaman failed to cooperate with the DHS. They rely on his affidavit stating, in part, that he "*refused* to give [the DHS] any opinion regarding the credibility of the father's story or regarding child abuse." (Emphasis added.) But, a person does not need to give an opinion on the ultimate issue in order to be "aiding and assisting in an assessment of a child abuse report." It is undisputed that Dr. Lindaman gave the DHS his biomechanical opinion that the fracture he observed *could have* been caused in the manner described by the father. The DHS relied on Dr. Lindaman in part in assessing whether the child was abused. He thereby aided in its assessment. That brings him within the scope of the statutory immunity. That he declined to say more does not defeat the immunity. There is no evidence Dr. Lindaman had a definitive opinion he intentionally withheld from Brown about the father's credibility or child abuse.

To allow this lawsuit to proceed would unwind statutory immunity. Many people when dealing with the government are hesitant to offer views on whether individuals under investigation are or are not guilty or are or are not lying. To deny immunity to a doctor who offers his medical observations in good faith but declines to go this extra step would deter doctors from responding to DHS inquiries altogether out of fear of being sued.[5]

---

[5]Notably, plaintiff's counsel conceded at oral argument that if Dr. Lindaman had said *nothing* to the DHS he could not have been sued. Moreover, the very opinion that Dr. Lindaman declined to give to the DHS, i.e., whether the father was credible or not, is one that normally would not be allowed to be given in a courtroom. *See State v. Dudley*, 856 N.W.2d 668, 677 (Iowa 2014) (reaffirming our commitment "to the legal principle that an expert witness cannot give testimony that directly or indirectly

The Nelsons also criticize the scope of the examination that Dr. Lindaman performed on June 26. But, the criticism does not relate to Dr. Lindaman's medical treatment of E.N.'s fracture. Rather, plaintiffs' argument is that Dr. Lindaman should have done more to look for signs of child abuse, and if he had done more, he would have offered different opinions to the DHS. Again, there is no claim that Dr. Lindaman acted in bad faith; plaintiffs' argument is merely that Dr. Lindaman was negligent in performing his role in E.N.'s child abuse assessment.

Defendants moved for summary judgment on several other grounds—lack of evidence to prove causation or the willful and wanton misconduct required for punitive damages. Because we conclude the immunity defense is dispositive, we do not reach those alternative grounds for summary judgment.

**IV. Disposition.**

For those reasons, defendants were entitled to summary judgment on all claims based on the immunity in Iowa Code section 232.73. We therefore reverse the district court's order denying their motion for summary judgment and remand the case for entry of an order granting summary judgment in favor of defendants.

**REVERSED AND REMANDED WITH DIRECTIONS.**

All justices concur except Cady, C.J., who concurs specially, and Appel and Hecht, JJ., who dissent.

---

comments" on the credibility of a witness); *State v. Myers*, 382 N.W.2d 91, 97 (Iowa 1986) (stating "most courts reject expert testimony that either directly or indirectly renders an opinion on the credibility or truthfulness of a witness").

**CADY**, **Chief Justice (concurring specially).**

I concur in the result reached by the majority. It is a result that ultimately comes down to the reasonableness of the permissible inferences that would support a finding of the lack of good faith of Dr. Lindaman during the time he assisted in the assessment of child abuse. There is evidence in the record to show Dr. Lindaman participated in good faith, though mistaken in medical fact. On the other hand, the evidence in the record does not support a legitimate inference that Dr. Lindaman was seeking to avoid the assessment of child abuse or that he did not express an honest belief. The inferences raised by the Nelsons concerning Dr. Lindaman's lack of good faith were too speculative to raise a genuine issue of material fact. Accordingly, summary judgment based on immunity granted under Iowa Code section 232.73 (2009) is appropriate.

**APPEL, Justice (dissenting).**

I respectfully dissent.

I first review the factual record presented in the defendants' motion for summary judgment, making all inferences favorable to the plaintiffs as the nonmoving party.[6]  Second, I review the relevant Iowa statutes.  In particular, I note the distinction in the immunity provisions of Iowa Code section 232.73 (2009) between the first prong of the statute, involving mandatory reporting, and the second prong of the statute, which extends immunity to those "aiding and assisting in an assessment of a child abuse report" made to the Iowa Department of Human Services (DHS). Third, I examine the manner in which Iowa courts and other jurisdictions have handled motions for summary judgment involving immunity statutes.  Finally, I apply principles gleaned from the previous discussion to the unique facts of this case.  As will be seen below, I conclude the trial court correctly denied summary judgment in this case.

---

[6]As a preliminary matter, I note the plaintiffs' claim that the defendants' amendment to their answer asserting the affirmative defense of immunity under Iowa Code section 232.73 (2009) should have been denied.  The majority notes, in a footnote, that the plaintiffs did not specifically use the term "abuse of discretion" to describe the appropriate standard of review for a district court's decision to allow an amendment to the pleadings in their appellate brief before this court.  I would not find the argument waived for failure to state the magic words of the undisputed standard of review.  *See Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 766, 768 (Iowa 2002) (allowing amendment subject to abuse of discretion).  On the merits, however, the motion to amend came four months prior to the discovery and pleading deadlines and five months before the scheduled trial.  Further, from the beginning of the litigation, the nature of Dr. Lindaman's participation in the Iowa Department of Human Services investigation was identified as a factual issue.  The plaintiffs did not seek an extension of time in the summary judgment proceedings to conduct further discovery with respect to the immunity issue.  Under these circumstances, I agree the district court did not abuse its discretion in allowing the amendment in this case.

**I. Overview of the Summary Judgment Record Viewed Most Favorably to the Plaintiffs.**

E.N. was brought to the hospital by his parents on June 18, 2009, with a broken arm. His injury was a spiral fracture. A spiral fracture of the bone runs at an angle through the bone rather than evenly across it. Spiral fractures usually require a twisting force to occur.

When asked at the emergency room how the injury occurred, E.N.'s father stated that he was putting E.N. on his bed, that the child put his arm behind his back, and that E.N.'s weight caused the bone to snap. At the time, E.N. was a twenty-two-day-old infant, who weighed eight pounds, eleven ounces.

Dr. Scott Barron, the emergency room physician who first examined E.N., suspected nonaccidental injury. Dr. Barron told E.N.'s father that he was required to report the fracture to DHS. E.N. was admitted to the hospital under the care of Dr. Douglas Selover, who also suspected nonaccidental injury.

Dr. Selover contacted Dr. Lynn Lindaman, a pediatric orthopedic surgeon, to provide consultation with respect to E.N.'s fracture. When asked by a DHS child protective worker about E.N.'s injuries the following day, Dr. Lindaman responded that the father's story of how the injury occurred was "plausible." A contemporaneous DHS record describes the conversation as follows:

> This worker questioned as to whether a child, weighing only 8 lbs 11 oz, would have enough force to create this injury. I also provided information that dad had provided a different explanation with how he laid [E.N.] down, with one hand under his head and the other under his butt. I also questioned as to whether a crying child's arm would go back behind him as he would more likely to be pulling his arms tight in front of him. Through this line of questioning, he stated on several occasions, "the mechanism they described fits the fracture seen."

When informed of Dr. Lindaman's statement that the father's story of how the injury occurred was "plausible," Dr. Selover exclaimed, "You got to be kidding." Dr. Selover talked with Dr. Lindaman about the cause of the injury during E.N.'s initial hospitalization. At that time, Dr. Selover expressed his view that it was a pretty clear-cut case of nonaccidental injury.

While DHS staff continued to be suspicious of the injury, Dr. Lindaman's repeated statements that the father's story was "plausible" and that "the mechanism" described by the father "fits the fracture," caused them pause. Prior to talking to Dr. Lindaman, DHS planned to seek a no-contact order against E.N.'s father. After talking with Dr. Lindaman, the DHS child protective worker consulted her supervisor. She was concerned the orthopedic specialist treating E.N. had repeatedly emphasized that the mechanism described by the father "fit the injury." They interpreted his comments as an opinion not supporting the presence of child abuse. As a result, the decision was made not to seek a no-contact order at that time. DHS staff, however, informally urged the mother not to allow E.N. to be with his father alone, but no further immediate action was taken at the time of E.N.'s discharge from the hospital.

DHS continued to have concerns about E.N., however, and the case was presented to a multidisciplinary team for review. The team included five physicians with experience in evaluating cases of child abuse. At a meeting on June 30, all agreed the injury could not have occurred as described by the father. One of the participants, Dr. Resmiye Oral, requested medical records for further review by orthopedic specialists to confirm the unanimous view of team members.

Dr. McAuliff, another physician, was dispatched to confer with Dr. Lindaman.

On July 6, the evaluators at the University of Iowa sent an email advising that the injury could not have happened as indicated by E.N.'s father. On July 7, DHS began working with the county attorney to file a no-contact order.

On July 8, Dr. McAuliff shared with the multidisciplinary team that he had spoken with Dr. Lindaman. Dr. Lindaman was more forthcoming with Dr. McAuliff than he had been with DHS staff earlier in the case. Dr. Lindaman told Dr. McAuliff that he had not seen many infants in his practice and had never seen this type of injury before. In light of his discussion with Dr. McAuliff, Dr. Lindaman agreed that the injury was suspicious.

Unfortunately, on July 8, before DHS served the no-contact order, E.N. arrived at the hospital with head trauma and other very serious injuries.

In June of 2011, the plaintiffs filed suit naming Dr. Lindaman, his professional corporation, and Mercy Medical Center – Des Moines as defendants. A deposition of Dr. Lindaman was part of the summary judgment record. At the deposition, Dr. Lindaman took a very narrow view of his professional responsibilities and the nature of his discussions with DHS.

Dr. Lindaman took the position that his job was the management of the fracture and the concerns of Dr. Barron, that the trauma may have been nonaccidental, was not his concern because it did not impact his management of the fracture. Dr. Lindaman stated that he did not explore whether the injury was in fact consistent with the father's explanation because "that's an investigative function through DHS or to

the police, not [] medical." He further stated that "to investigate whether the mechanism happened the way dad explained, that's not a medical investigation. That's a legal or criminal investigation." Dr. Lindaman testified that in his interaction with DHS, "[h]e was not providing information on the safety of the child. [He] was providing information only on the humerus fracture." According to Dr. Lindaman, his statement to DHS was "merely on [his] orthopedic evaluation of [E.N.]. [H]e was not speaking with them on judging what happened at [E.N.]'s home."

Dr. Lindaman also testified in his deposition that while the father's story "could be consistent" with the injury, it would not commonly occur when putting the child down and would be "a rare kind" of injury. He stated in his deposition that if he had been the emergency room physician on the day E.N. arrived, he too would have reported the injury to DHS the way Dr. Barron did.

Dr. Lindaman also filed an affidavit in connection with the "Motion for Summary Judgment as to the Lindaman Defendants." In that affidavit, Dr. Lindaman stated that the only opinion he developed was that "if the history the father was providing to [him] was true, that history could possibly be consistent with the type of spiral humeral fracture [he] observed in this child."

He further stated that he was aware of the opinions of Dr. Selover and Dr. Barron suspecting child abuse prior to his conversation with DHS. He stated he was not surprised that the child abuse investigators seemed to have concluded that E.N.'s fracture was due to child abuse "since spiral humeral fractures in non-ambulatory children are rare." He also asserted he would have reported the incident to DHS if the case had been reported to him in the first instance.

The records of Dr. Lindaman's conversations with DHS, however, do not indicate that he advised DHS that he took a very narrow view of his responsibilities and that he was not "judging [assessing?] what happened at E.N.'s home." He did not advise DHS that spiral humerus fractures in nonambulatory children are rare, that he would have reported the incident had E.N. been presented to him in the first instance, or that his opinion was limited solely to the biomechanics of the possibility of a fracture occurring if the story told by E.N.'s father were true. He simply repeatedly told DHS that the story was "plausible" and the "mechanism" described "fit the injury."

The record in the proceedings related to the motion for summary judgment contained the report of one of the plaintiffs' experts, Dr. Geoffrey Miller, an orthopedic surgeon. In reviewing the file, Dr. Miller stated that while it was possible Dr. Lindaman may have simply made an oversight in his initial opinion,

> the orthopedic surgeon did not make the diagnosis of non-accidental trauma in his consult, even as a possibility even though he acknowledged an ongoing workup for that diagnosis. This could be an oversight, but his decisions afterwards make this explanation tenuous at best. It does not appear to have been an oversight with the repeated opportunities to modify the diagnosis after meeting with DHS and other treaters, as well as his deposition testimony . . . where he specifically disagreed with other doctors.

In a supplemental report, Dr. Miller characterized the failure of Dr. Lindaman to detect rib trauma in E.N. as "further evidence of this doctor's inexplicable and stunning disregard for the suspected child abuse diagnosis made by both of the other treaters." Another of the plaintiffs' medical experts opined that Dr. Lindaman "obtained a history that makes no sense as a reasonably certain medical explanation for a cause of a spiral fracture in a 22 day old infant."

The district court held that there were genuine issues of material fact as to whether the defendant doctor rendered an opinion or not for DHS, whether reliance on that opinion caused injury to the child, whether the doctor's communications to DHS were in good faith or not, whether the doctor's conduct was actually aiding or assisting in a child abuse assessment, and whether the doctor's conduct was entitled to immunity for his conduct. We granted the defendants leave to file an interlocutory appeal.

## II. Iowa's Child Protection Reporting and Immunity Regime.

**A. History of Concern Regarding Failure to Report Suspected Child Abuse.** For many years, underreporting of child abuse by medical professionals has been recognized as a significant problem. Concern about participation of medical professionals in the child abuse reporting system continues notwithstanding the passage of mandatory child abuse reporting statutes. As noted by one commentator, "fear of legal action is frequently a reason for not reporting." Marjorie R. Freiman, Note, *Unequal and Inadequate Protection Under the Law: State Child Abuse Statutes*, 50 Geo. Wash. L. Rev. 243, 263 (1982). According to an article in the prestigious journal of the American Medical Association, physicians sometimes do not wish to get involved in child abuse reporting situations, despite the fact that statutes mandate such actions. *See* John M. Leventhal, *The Challenges of Recognizing Child Abuse: Seeing is Believing*, 281 J. Am. Med. Ass'n 657, 658 (1999).

According to yet another commentator:

[R]ecent studies reveal that physicians admit that they do not report all suspected cases of child abuse and neglect. They offer several justifications for this noncompliance. The most common explanations are concerns about the way child protection agencies handle reported cases and beliefs that state involvement often does not help the child. Some

physicians publically admit that they do not want to get involved with the legal system, a sentiment probably held privately by many physicians.

Ellen Wright Clayton, *To Protect Children from Abuse and Neglect, Protect Physician Reporters*, 1 Hous. J. Health L. & Pol'y 133, 140–41 (2001) (footnotes omitted).

**B. Overview of Iowa Statutory Framework.** Part two of division III of Iowa Code chapter 232 addresses child abuse reporting, assessment, and rehabilitation. *See* Iowa Code §§ 232.67–.77. Iowa Code section 232.67 provides explicit legislative findings. Under this Code provision, the legislature declared "[c]hildren in this state are in urgent need of protection from abuse." *Id.* § 232.67. The legislature further stated the purpose of the statutory provisions was "to provide the greatest possible protection to victims or potential victims of abuse through encouraging the increased reporting of suspected cases of abuse, [and] ensuring the thorough and prompt assessment of these reports." *Id.*

In order to achieve the legislative purpose, chapter 232 part two establishes a system of mandatory and permissive reporters of child abuse, a reporting procedure, and a structure for investigation of reports by DHS. *Id.* §§ 232.69–.77. Knowing and willful violations of reporting obligations are a simple misdemeanor, *id.* § 232.75(1), as is the knowingly false reporting of child abuse, *id.* § 232.75(3). A person who knowingly fails to report or interferes with mandatory reporting is civilly liable for damages proximately caused by such failure or interference. *Id.* § 232.75(2).

While the statute thus imposes affirmative obligations on mandatory reporters, it also contains an immunity provision which is at

the heart of this appeal. The immunity provision in Iowa Code section 232.73(1) provides that

> [a] person participating in good faith in the making of a report . . . or aiding and assisting in an assessment of a child abuse report . . . shall have immunity from any liability, civil or criminal, which might otherwise be incurred or imposed.

The statute has two classifications for immunity. The first prong protects persons who "make a report" of child abuse under Iowa Code chapter 232. *Id.* § 232.73(1). Dr. Lindaman plainly does not fall in this category. The statute also provides, however, that immunity extends to persons who in good faith are "aiding and assisting in an assessment of a child abuse report" by DHS. *Id.* It is the second prong of the statute that is implicated in this case.

**C. Applicable Iowa Caselaw.** We have had a few occasions to interpret the immunity provision of Iowa Code section 232.73. The first case is *Maples v. Siddiqui*, 450 N.W.2d 529 (Iowa 1990). In that case, the plaintiffs filed a medical malpractice action against the defendant, Dr. Siddiqui, claiming their son was placed in foster care because of an improper diagnosis of the cause of the child's malnutrition. *Id.* at 529. The plaintiffs sought to recover for their loss of companionship as a result of the removal of their son from their home. *Id.* In this case, we held that Dr. Siddiqui, on the facts presented, was entitled to immunity. *Id.* at 530–31.

We rejected the notion that the immunity statute did not apply because the action was a medical malpractice action. *Id.* at 530. Instead, we focused on "the causal theory of plaintiffs' loss-of-companionship claim." *Id.* We noted the claim was tied to the court-ordered placement "[i]rrespective of the other elements of damage which might have resulted from defendant's improper diagnosis." *Id.* Clearly,

*Maples* does not stand for the proposition that there can be no recovery in a medical negligence claim where a report of child abuse is involved. The immunity in Iowa Code section 232.73 where a good-faith report has been made extends only to the extent that the plaintiff's claim for damages is causally tied to the report itself. *See id.*

In *Maples*, we also considered whether alleged negligence is sufficient to defeat the good-faith requirement of the immunity statute. *Id.* We concluded that a showing of negligence does not defeat good faith. *Id.* If negligence alone was sufficient to defeat good-faith immunity, we reasoned, the immunity statute would be deprived of its bite. *Id.* We did not hold, of course, that immunity applies to all cases where negligence was involved, but only that a showing of negligence was not sufficient to deprive a defendant of an immunity defense if good faith under one of the prongs of the immunity statute could be established. *See id.*; *cf. Whaley v. State*, 956 P.2d 1100, 1106 (Wash. Ct. App. 1998) (holding immunity in child abuse reporting statute extends only to damages caused by the making of a child abuse report).

Our second case dealing with the immunity provisions of Iowa Code section 232.73 is *Garvis v. Scholten*, 492 N.W.2d 402 (Iowa 1992). In *Garvis*, the plaintiff asserted the defendants improperly disclosed certain confidential medical information in the course of a child abuse investigation. *Id.* at 402. The fighting issue in the case was whether the good-faith standard in the statute was objective or subjective. *Id.* at 403–04.

We held the standard for good faith was subjective. *Id.* We declared "[g]ood faith in section 232.73 rests on a defendant's subjective honest belief that the defendant is aiding and assisting in the investigation of a child abuse report." *Id.* at 404. We quoted a case from

the commercial context noting that good faith means only honesty in fact, colorfully described as including situations involving " 'the pure heart and empty head.' " *Id.* (quoting *Jackson v. State Bank of Wapello*, 488 N.W.2d 151, 156 (Iowa 1992)).  Because the "subjective good faith in aiding and assisting the investigation went unchallenged," we declined to disturb the district court's ruling sustaining the defendants motion for summary judgment.  *Id.*

The takeaway points from *Maples* and *Garvis* are important but narrow.  First, *Maples* establishes that the mere presence of negligence is plainly insufficient to defeat immunity.  450 N.W.2d at 530–31.  Second, *Maples* stands for the proposition that immunity applies to damage claims causally related to the reporting or aiding and assisting in an assessment of a child abuse report or a child abuse investigation.  *Id.* Third, *Garvis* held that the standard for evaluating the making of a report or aiding and assisting a child abuse investigation is "subjective honest belief" in making a report or in "aiding and assisting in the investigation of a child abuse report."  492 N.W.2d at 404.  In neither of these cases did we address the question of the proper standards to be applied in a motion for summary judgment based on the immunity provision.  To that I now turn.

### III.  Standards for Summary Judgment of Immunity Claims.

Courts considering immunity defenses in the context of motions for summary judgment have taken a variety of approaches.  In some cases, courts have determined that immunity issues should be decided by the court in advance of trial in order to achieve the policy purposes that underlie immunity.  *See, e.g., May v. Se. Wyo. Mental Health Ctr.*, 866 P.2d 732, 738–39 (Wyo. 1993).  At the other extreme, some courts have held that questions of subjective good faith always involve questions of

fact. *See, e.g.*, *de Abadia v. Izquierdo Mora*, 792 F.2d 1187, 1191 (lst Cir. 1986) (noting that on the "issue of subjective good faith, there might always be a question of fact [and that] it is difficult to think there could ever be summary judgment"); *Sabia v. Neville*, 687 A.2d 469, 473 (Vt. 1996) (rejecting a subjective good-faith standard because "a material issue of fact would always be present, precluding summary judgment" (internal quotation marks omitted)). In between the two poles, some courts have employed a shifting burden of production approach where once a defendant makes a prima facie case for immunity, the burden shifts to the plaintiff to produce at least some evidence from which an inference of lack of good faith can be drawn. *See, e.g., S.G. v. City of Monroe*, 843 So. 2d 657, 662 (La. Ct. App. 2003).

Even when summary judgment for the defendant is not precluded in subjective good-faith immunity cases, however, the courts recognize there is rarely direct evidence of subjective good faith, and as a result, reasonable inferences that can be drawn from circumstantial evidence are sufficient to generate a fact question on the issue. *See United States v. Sullivan*, 406 F.2d 180, 186 (2d Cir. 1969) (noting intent is rarely susceptible of direct proof and must be established by legitimate inferences from circumstantial evidence); *Van Nattan v. United States*, 357 F.2d 161, 162 (10th Cir. 1966) (intent is seldom shown by direct evidence and "in most cases must be proved by inference from the facts and circumstances of the particular case");[7] *Synthon IP, Inc. v. Pfizer Inc.*,

---

[7]The holdings in these cases, of course, provided the impetus for the United States Supreme Court to adopt an objective good-faith test in immunity cases involving alleged government official misconduct. *See generally Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S. Ct. 2727, 2738–39, 73 L. Ed. 2d 396, 410–11 (1982).

472 F. Supp. 2d 760, 779 (E.D. Va. 2007) (noting that intent rarely can be proven by direct evidence).

In Iowa, we have not yet considered the proper approach to summary judgment when the plaintiffs contest the defendant's claim of good-faith immunity under Iowa Code section 232.73.  In *Maples*, the issue was not how to approach the question of subjective good faith in the context of summary judgment, but only whether the presence of negligence defeated immunity under the statute.  450 N.W.2d at 530.  In *Garvis*, although summary judgment was granted, no one contested the subjective good faith of the defendants and thus the result in the case does not help us in this particular situation when subjective good faith is contested.  492 N.W.2d 404.

We have, however, applied our summary judgment framework in other immunity contexts when subjective good faith has been at issue.  In *Hlubek v. Pelecky*, 701 N.W.2d 93, 94 (Iowa 2005), we considered whether area education agency (AEA) officials were entitled to summary judgment in a case in which the plaintiff charged they tortiously interfered with his contractual and prospective business relations and intentionally inflicted emotional distress by investigating charges of sexual abuse.  The applicable statutes provided immunity for AEA personnel who participated in good faith and acted reasonably in such investigations.  *Id.* at 96–97 (citing Iowa Code sections 280.27 and 613.21 (2001)).  We held the evidence showed the defendants had acted in good faith and the plaintiff "ha[d] presented no contrary evidence on the issue."  *Id.*  We applied a similar approach in *Green v. Racing Association of Central Iowa*, 713 N.W.2d 234, 245–46 (Iowa 2006).

If the approach in *Hlubek* and *Green* were applied under Iowa Code section 232.73, a declaration of subjective good faith by a defendant

might ordinarily be sufficient to require the plaintiff to produce evidence from which legitimate inferences of lack of good faith could be shown. Yet, even under this type of approach, as observed in a case cited by the majority, questions of subjective good faith are "ordinarily" not resolvable upon summary judgment.[8] *Rite Aid Corp. v. Hagley*, 824 A.2d 107, 119 (Md. 2003) (internal quotation marks omitted);[9] *see also Miller v. Dep't of Corr.*, 115 P.3d 77, 97 (Cal. 2005) (noting "issue of a plaintiff's subjective, good faith belief involves questions of credibility and ordinarily cannot be resolved on summary judgment"); *Hoefer v. Wis. Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 340 (Iowa 1991) (whether statements were expressions

---

[8]The caselaw repeatedly emphasizes the difference between "objective good faith," which is more amenable to summary judgment, than "subjective good faith," which turns on credibility issues. The leading case is *Harlow*, in which the Court rejected a subjective good-faith standard in the context of immunity in favor of objective good faith because subjective good faith "rarely can be decided by summary judgment." 457 U.S. at 816–18, 102 S. Ct. at 2737–38, 73 L. Ed. 2d at 409–10; *see also Maestas v. Lujan*, 351 F.3d 1001, 1011 (10th Cir. 2003) (noting that in order "to encourage courts to resolve qualified immunity questions on summary judgment, the Court removed the subjective-good-faith factor"); *Rowan County v. Sloas*, 201 S.W.3d 469, 474–84 (Ky. 2006) (contrasting availability of summary judgment when immunity is objective good faith with lack of availability of summary judgment when a subjective good-faith standard is employed); *Sabia*, 687 A.2d at 473 (rejecting subjective good-faith standard in immunity context because summary judgment would not be available).

[9]The majority cites a number of child abuse statutory immunity cases in which summary judgment was granted. Many are distinguishable from the present case in that they do not involve an alleged failure to aid and assist a child abuse investigation, but instead involve a challenge to a report of child abuse. *See Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 318 (4th Cir. 2009) (noting immunity asserted based upon affirmative report of child abuse); *Watson v. County of Santa Clara*, 468 F. Supp. 2d 1150, 1156 (N.D. Cal. 2007) (noting that California statute grants immunity with respect to mandated or authorized reporting, but not aiding and assisting); *S.G. v. City of Monroe*, 843 So. 2d 657, 659–60, 661 (La. Ct. App. 2003) (noting physician moved for summary judgment on ground that she was immune from liability based upon affirmative report of child abuse). In addition, some of the cases cited by the majority involve a different substantive standard than that applicable under Iowa law. *See Wolf*, 555 F.3d at 318 (noting Virginia statute employs a strong presumption of immunity and places the burden on person who would overcome immunity); *O'Heron v. Blaney*, 583 S.E.2d 834, 836–37 (Ga. 2003) (noting that immunity sustained based on "objective" reasonable cause to suspect child abuse has occurred, unlike under the Iowa statute).

of insincere opinion intended to deceive or mislead was "ordinarily a jury question" (internal quotation marks omitted)).

The consequence of the *Hlubek–Green* type approach is that subjective good faith is determined through an examination of the circumstances in each particular case, and "proof of intent or state of mind is rarely established as fact by direct evidence, but may be inferred from the facts regarding the individual's actions or other circumstances." *S.G.*, 843 So. 2d at 662. In the summary judgment context, of course, all legitimate inferences are made in favor of the nonmoving party. *Wallace v. Des Moines Indep. Cmty. Sch. Dist. Bd. of Dirs.*, 754 N.W.2d 854, 857 (Iowa 2008).

### IV.  Application of Principles.

I now turn to the application of the above principles to the facts of this case. There is no question under our caselaw, and under the majority of caselaw from other jurisdictions, that the mere fact that Dr. Lindaman may have been negligent in his evaluation of E.N. is not sufficient to escape the application of the immunity provided by Iowa Code section 232.73. *See Garvis*, 492 N.W.2d at 404. And, while it is true the immunity provision applies only with respect to damages caused by a report or by a bad faith failure to aid and assist, *Maples*, 450 N.W.2d at 530, the plaintiffs make no suggestion on appeal that damage to E.N. was caused by anything other than the failure of the state to intervene under chapter 232.

Turning to the specific language of the immunity statute, it is important to recognize that this case does not involve a situation in which a mandatory or permissive reporter triggers a DHS investigation by making a report protected by the immunity provision of Iowa Code section 232.73. Dr. Lindaman filed no report with DHS. While the

legislature plainly desired to encourage reports of suspected child abuse when it enacted the child protection provisions of the Code, *id.* § 232.67, these policy reasons are not at work in this case. This case does not involve protecting a mandatory reporter who stepped forward to report suspected child abuse and is entitled to immunity in order to encourage others to do the same.

Instead, this case involves the second or the aiding-and-assisting-in-an-assessment-of-a-child-abuse-report prong of Iowa Code section 232.73. And, this case involves a claim of failure to aid and assist in good faith, not an arguably overzealous report of suspected child abuse. The question is not whether Dr. Lindaman did too much, but whether he did too little. Specifically, the question raised in this case is whether Dr. Lindaman was in "good faith" engaged in "aiding and assisting" DHS "in an assessment of a child abuse report." *Id.* § 232.73.

There is evidence in the record that Dr. Lindaman was in fact avoiding aiding and assisting in an assessment of a child abuse report. He testified that in his conversations with DHS, he was not "judging what happened at E.N.'s home" and that he was "not providing information on the safety of the child." This does not sound like aiding and assisting in an assessment of a child abuse report by any standard, objective or subjective. Further, if he were acting in subjective good faith, and aiding and assisting in an assessment of a child abuse report, surely he would have disclosed that spiral fractures in infants are "very rare" and that if he would have been the physician during intake, he would have filed a child abuse report too. He disclosed these views when defending a lawsuit against him, but he did not offer them to DHS when it was assessing the report of child abuse involving E.N. The fact he did not offer these views to DHS suggests he did not see his role as aiding and

assisting *in an assessment* of the child abuse report. He was not judging, and he was not providing information relating to safety.

In addition, a jury could conclude that Dr. Lindaman's minimal and cramped response to DHS was designed to further his own interest in not getting drawn into a potentially controversial matter. Surely, a subjective desire of not wanting to get involved or to pass the buck to someone else would be an ulterior motive that would defeat subjective good faith under the statute. Indeed, the existence of such motivations among professionals was one of the reasons for the enactment of child abuse reporting statutes in the first place.

There is other evidence that supports inferences against Dr. Lindaman's claim of entitlement to immunity. According to the plaintiffs' view of the evidence, the notion that a twenty-two-day-old baby, after placed in bed by his father, put his arm behind his back and then suffered a spiral fracture under his own weight is obviously suspect. Indeed, the plaintiffs' point to Dr. Selover's contemporary reaction to Dr. Lindaman's position, namely the exclamation, "You got to be kidding." Yet, Dr. Lindaman declared that the father's story was "plausible" and the mechanism "fit the injury." He defended his responses in his deposition as technically correct as a theoretical matter. However, he further emphasized in his deposition that he viewed the assessment of whether child abuse occurred as someone else's responsibility as it did not relate to his management of the fracture. Is this "not-my-department" type of response consistent with subjective good faith in "aiding and assisting in an assessment of a child abuse report?" Could a reasonable jury conclude that Dr. Lindaman was attempting to avoid entanglement in a sticky situation rather than aid and assist DHS in its investigation? Instead of cooperating with DHS

investigators and others on the medical team in a collaborative fashion, could a reasonable jury conclude that Dr. Lindaman preferred to head for the exit and allow others to take responsibility rather than get involved? Could a reasonable jury conclude that his evasive responses were not aiding and assisting in an assessment of a child abuse report, but really an act of stone walling and hand washing? If so, then Dr. Lindaman was not aiding and assisting in an assessment of a child abuse report in subjective good faith under Iowa Code section 232.73.

The lack of support in the record for his position from every other physician who reviewed the file as part of a child abuse assessment arguably tends to support the inference that Dr. Lindaman just did not want to get involved. The plaintiffs point to Dr. Selover's statement, "You got to be kidding," as telling. And as stated by the plaintiffs' expert, Dr. Lindaman held to his opinion long after it made any sense to do so. He arguably originally decided to give a brusque, incomplete, and even misleading answer to DHS in a verbal game designed to avoid getting drawn into a controversy and then decided to attempt to avoid professional embarrassment by defending it when challenged by Dr. Selover. His attitude toward the DHS assessment could be regarded as not a good faith "how can I help you?" but rather something else, a defensive posture akin to "don't ask me, I'm just the bone guy, I'm not responsible. Anything is possible. Don't confuse me with the facts or the opinions of others. I'm busy. Good-bye."[10]

---

[10]It is apparent from the record that Dr. Lindaman sought to restrict his exposure to a claim of negligence by limiting his role in the treatment of E.N. to the management of the fracture. While this strategy may be an effective defense with respect to limiting the scope of his duty in the underlying negligence claim, it tends to undercut his claim of statutory immunity because he was not aiding and assisting in an assessment of a child abuse report, but was instead focused solely on management of the fracture.

Of course, a jury could well come to a much more favorable conclusion after assessing Dr. Lindaman's credibility and hearing all the evidence. There is no question that on the evidence presented a reasonable jury could conclude he was expressing his honest opinion and he was not very knowledgeable about infants. Perhaps, as the saying goes, a jury could conclude this is a case involving a defendant with " 'a pure heart and an empty head.' " *Garvis*, 492 N.W.2d at 404 (quoting *Jackson*, 488 N.W.2d at 156). Alternatively, a reasonable jury could conclude the real problem in this case was that DHS investigators misconstrued Dr. Lindaman's statements and erroneously concluded that his observation that the mechanism described "fit the injury" was by implication a statement of opinion that child abuse did not occur, or at least was not substantiated, and not realize they were receiving a "don't-ask-me-that's-not-my-department" type answer. However, the question is whether, on its unique facts, the plaintiffs have enough evidence from which legitimate inferences may be drawn to proceed with the case. I conclude there was enough to do so.

In closing, I note the result today does not promote the policies of the child abuse reporting statutes. This case should not be confused with a reporting case in which a professional takes the sometimes difficult but legally required step of reporting suspected child abuse. In that setting, generous immunity may be appropriate. There, the statute demands the reporter receive the benefit of the doubt and may be deprived of immunity only if not acting in good faith.

Here, however, the question is whether Dr. Lindaman's minimal and narrow participation in the assessment of the child abuse report was sufficient to entitle him to statutory immunity that requires good faith in the aiding and assisting in an assessment of a child abuse report. The

policies underlying immunity can certainly be offended by making it too difficult to obtain, but the policies of the statute are also undermined by extending immunity too far. One must ask whether stretching immunity in Iowa Code section 232.73 to cover the unique circumstances of this case " 'provide[s] the greatest possible protection to victims or potential victims of abuse through encouraging the increased reporting of suspected cases of such abuse [and] insuring the thorough and prompt investigation of these reports.' " *State v. King*, 434 N.W.2d 627, 629 (Iowa 1989) (quoting Iowa Code § 232.67 (1987)). I doubt it. By granting summary judgment on the immunity question in this setting, when the plaintiffs' claim of lack of subjective good faith in aiding and assisting in an assessment of a child abuse report is at least plausible, to use Dr. Lindaman's unfortunate term, I fear the purposes of the mandatory reporting statute will not be promoted, but will be undermined. I fear the takeaway from this case will be that evasive and uncooperative responses to DHS child abuse investigators will be regarded as legally protected conduct. If so, our child protection system has lost some of its teeth. I hope I am wrong in that regard.

The undisputed bottom line, however, is that the child abuse reporting system failed E.N. in this case, with tragic results.

Hecht, J., joins this dissent.